# IN THE COURT OF APPEALS OF IOWA

No. 20-1552
Filed March 30, 2022

IN RE THE MARRIAGE OF ALISA DANAE SUNDBY
AND TAYLOR RAY SUNDBY

Upon the Petition of
ALISA DANAE SUNDBY,
  Petitioner-Appellee,

And Concerning
TAYLOR RAY SUNDBY,
  Respondent-Appellant.

_____

Appeal from the Iowa District Court for Marion County, Robert B. Hanson, Judge.

The husband appeals the dissolution and attorney fee ruling. **AFFIRMED AS MODIFIED AND REMANDED.**

Andrew B. Howie and Tara L. Hofbauer of Shindler, Anderson, Goplerud & Weese, P.C., West Des Moines, for appellant.

Ryan J. Baumgartner of Cashatt Warren Family Law, P.C., Des Moines, for appellee.

Considered by Schumacher, P.J., Ahlers, J., and Blane, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2022).

**BLANE, Senior Judge.**

Taylor Sundby appeals the decree dissolving his marriage to Alisa (Ali) on many grounds. On our review, we affirm the decree as modified and remand for further proceedings.

## I. Background facts and proceedings.

Taylor and Ali stipulated that they entered into a common law marriage in 2004. The parties have four children: H.R.S. (born 2003), C.R.S. (born 2006), B.D.S. (born 2008), and K.M.S. (born 2012). The children reside with Ali at the family home in Harvey, Iowa, where the family has lived for the past three years since returning from Colorado. The home is one block from Ali's parents. The parties also stipulated that Ali would have primary care of the children.

At the time of the trial, Taylor was forty years old and has a degree in chemical engineering. Since 2004 he has been employed as a quality manager for Danaher Company, headquartered in Loveland, Colorado. The company also has a chemical manufacturing distribution plant in Ames, where Taylor has worked since moving to Iowa. Since their separation, Taylor has resided in Pleasant Hill, but he testified he intended to move back to Colorado in November 2019.[1]

Ali was thirty-eight years old at the time of trial. She has a high school education and has taken part-time classes at community colleges, but she has not obtained any degree, special training, or certification. She previously worked part-

---

[1] As with most appeals, our knowledge is frozen in time based upon the record made before the district court, so we do not know if anticipated events actually occurred.

time waitressing and at a call center, but she has stayed home with the children since 2003 when the parties' first child was born.

On October 9, 2018, Ali filed her petition for dissolution of marriage.[2]  The court filed its decree dissolving the marriage on March 10, 2020.  On March 23, 2020, the court filed a supplemental decree of dissolution of marriage addressing child support.  Both parties filed motions under Iowa Rule of Civil Procedure 1.904(2), and the court revised the child support.  Taylor then timely appealed.

## II.  Standard of review.

Because this is an equity action, our review is de novo.  *In re Marriage of Mann*, 943 N.W.2d 15, 18 (Iowa 2020) (citing Iowa R. App. P. 6.907).  "We give weight to the factual determinations made by the district court; however, their findings are not binding . . . ."  *Id.* (citation omitted).  We disturb the district court's rulings only where there is a failure to do equity.  *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013).

## III.  Discussion.

Taylor raises a number of challenges to the district court's dissolution decree.  We address each below.

### A.  Taylor allowed parenting time only in Iowa.

The parties agreed Ali would have physical care of the children, but she sought sole legal custody and that Taylor's parenting time be only in Iowa.  The district court awarded joint legal custody but agreed to limit Taylor's parenting time

---

[2] Taylor initially filed a motion to dismiss denying the existence of a marriage.  The district court denied the motion on December 7, 2018.  The court also stayed Taylor's separate paternity action between these parties.

to Iowa. Taylor argues on appeal that Ali "did not present any evidence that would justify the district court placing such extreme restrictions on Taylor's parenting time. . . . The district court made no findings pursuant to Iowa Code section 598.41(1) [(2018)] and [*In re Marriage of Rykhoek*, 525 N.W.2d 1 (Iowa Ct. App. 1994)], which would justify restricting Taylor's visitation." Taylor contends, under this record and in the children's best interests, he should be allowed to exercise at least some of his parenting time in Colorado. We do not agree.

The district court made the following findings supported by the evidence.

> It is clear from the record that Taylor's relationship with the older two children[3] has been strained, prior to and during the pendency of this action. Taylor's actions, including his employment of corporal punishment as a form of discipline and his periodic angry outbursts, are primarily responsible for this.
> Both [children] testified that their respective relationships with Taylor are not ideal but that, despite these difficulties, they love their father and want to restore/repair their respective relationships with him. However, they both indicate that this should be done gradually.
> The court finds that Taylor's relationship with the children should be fostered and that it is in their best interest to have parenting time with him albeit not in Colorado, considering their current state of fear and distrust of him as a result of his believed substance abuse and anger control problems. The court encourages the parties and their children to engage in counseling.

Later, the court concluded:

> Additionally, the court finds that, although Taylor and the two older children have had strain in their parent-child relationships, the most troubling events were isolated and occurred more than a year ago. Recently, the relationships between Taylor and the two oldest children seem to have improved. Taylor earnestly desires to rebuild his relationships with his children and maintaining the parent-child relationships with both parents is in the best interests of all of the parties' children. Having said that, the court also finds that rebuilding/restoring the relationships between Taylor and these children will take time and should be approached gradually given the

---

[3] Since the entry of the decree, the oldest child has turned eighteen years old and is no longer subject to the visitation provisions of the decree.

> obvious fear and distrust the children, especially the two oldest ones, have for him. Taylor's parenting time shall be as delineated herein but shall occur in Iowa and not in Colorado or elsewhere at this time.

In making a physical care arrangement, we consider the factors listed in Iowa Code section 598.41(3). *See In re Marriage of Hansen*, 733 N.W.2d 683, 696 (Iowa 2007). We do not resolve these questions based on "perceived fairness to the spouses, but primarily upon what is best for the child[ren]." *Id.* at 695 (emphasis omitted). "The objective . . . is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *Id.* Among the significant factors is to place the children where they have the "opportunity for the maximum continuing physical and emotional contact with both parents." Iowa Code § 598.41(1)(a).

Reviewing the record, we find the district court applied the proper legal standards and reached the correct conclusion. The court also described logical reasons for restricting the visits to Iowa. Taylor had not exercised visits with the two older children for eight months before the trial. If a parent's conduct before the dissolution raises concerns that visitation with that parent may cause "direct physical harm or significant emotional harm to the child," courts may reduce or eliminate visitation. *Rykhoek*, 525 N.W.2d at 4. Although restricting parenting time to Iowa may place additional burden on Taylor, this is necessitated in part by his decision to move back to Colorado. Considering the record, it is the children's best interest to initially impose this restriction. If Taylor's relationship with the children improves, he may seek to modify and remove this restriction.

### B. Spousal support award.

The parties agreed that Ali should be awarded rehabilitative alimony of some duration. Taylor requested that he be ordered to pay $500 per month for ninety months. Ali requested $2000 per month for ninety months. In the decree, the district court at first found Taylor's gross annual income to be $138,124. The court also imputed income to Ali of $15,600 per year. The court believed a middle ground appropriate. The court ordered Taylor to pay $2000 per month for forty-five months, followed by $1000 per month for another forty-five months. On appeal, Taylor asks us to find $500 per month should be ordered.

When determining an appropriate spousal support award, we consider all the factors in Iowa Code section 598.21A(1). Among those considerations is the tax consequences to each party. Iowa Code § 598.21A(1)(g). So we bear in mind that under recent federal income tax laws, spousal support payments Taylor makes are not tax deductible and payments Ali receives are not taxable income. *See Mann*, 943 N.W.2d 15, 21.

Taylor also argues that the district court did not properly evaluate his ability to pay or Ali's expenses and need for support. He contends that he does not have the cash flow to pay the amount ordered. During the proceedings, with his living expenses and attorney's fee payments ($1300 per month), as well as his obligations under the temporary order, he claims he had to borrow money from his parents to make ends meet.[4] In its ruling on the parties' rule 1.904(2) motions, the

---

[4] While the case was pending, under the pre-trial temporary order, in lieu of spousal support, Taylor had to pay the expenses related to the marital home, including the mortgage, taxes, and insurance of $2408 per month. Taylor was also ordered to pay $1900 per month in temporary child support. In the temporary order, Taylor

court determined Taylor's annual income was $128,852, a reduction of about $9200, or 7.2%, from the figure upon which spousal support was determined. On appeal, he does not challenge the court's post-trial finding his gross annual income is $128,852, or $10,738 per month.

Under the decree, Taylor must pay child support of $1657.84[5] and $2000 per month spousal support. Also, in the decree, Taylor was ordered to assume most of the marital debts that total over $9800, with monthly payments of $428. Ali was awarded the home and made responsible for the related expenses, so Taylor is no longer obligated. He was also ordered to pay $50,000 of Ali's attorney's fees. We have reviewed his obligations under the decree and his expenses and find he can pay spousal support.

Ali's imputed income is $1300 per month. We think she will probably not earn much more than that amount given her lack of advanced education and time outside the workforce. *See* Iowa Code § 598.21A(1)(d), (e). When the spousal and child support of $3657.84 is added, Ali's total monthly income is $4957.84, or $59,494.08 annually. At trial her evidence showed her monthly expenses included $651.33 for children's expenses, which are to be covered by the child support payment and not included in Ali's monthly expenses for spousal support. Ali listed her total expenses as $4393.59. When the children's expenses are deducted from

---

was ordered to pay all the parties' outstanding accounts. The temporary order referenced the accounts in Ali's financial affidavit, which included Kohl's, orthodontists, Sam's Club, Discover Card, Chase, CitiBank, PayPal, Nebraska Furniture Mart, medical bills, as well as Taylor's student loans. The affidavit stated the amounts were unknown, so we cannot determine the amount of the monthly payments Taylor was obligated to pay.

[5] This amount is from the order granting Taylor's rule 1.904(2) motion, modifying the child support.

this total, her monthly expenses that need to be considered in determining spousal support are reduced to $3742.26.

Considering Taylor's recalculated monthly income from that used to arrive at the spousal support in the decree, the reduction in Ali's expenses when children's expenses are covered by child support, and the taxation changes, justifies a reduction in Taylor's spousal support from $2000 to $1500 per month for forty-five months. We do not disturb the award of $1000 per month for the following forty-five months.

### C. Distribution of assets.

Taylor argues the district court "disregarded facts presented at trial that resulted in an inequitable property distribution that ultimately favored [Ali]." He complains "these errors individually and collectively justify modification of the lower court's decree on appeal."

"Iowa is an equitable distribution state." *In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006). "This 'means that courts divide the property of the parties at the time of divorce, except any property excluded from the divisible estate as separate property, in an equitable manner in light of the particular circumstances of the parties.'" *Id.* (citation omitted). We divide the marital property equitably based on the applicable factors contained in Iowa Code section 598.21(5). *McDermott*, 827 N.W.2d at 678. We review each of Taylor's claims in turn.

### i. Adoption of Ali's trial exhibit (Exhibit 163-2) for values and distribution of real and personal property.

Both Taylor and Ali submitted trial exhibits that identified their marital property, set out their respective valuations, and proposed distribution. The district court adopted Ali's Exhibit 163-2. In its decree, the court set out its reasoning for doing so:

> Both parties introduced exhibits outlining their respective proposals for distribution of the marital estate. See [Ali's] Exhibit 163-2 and [Taylor's] Exhibit FF. However [Taylor's] proposal did not include division of his restricted stock awards and units. The court believes that said awards and units must be included in the property distribution in order to make same fair and equitable and finds that [Ali's] proposal in her Exhibit 163-2 accomplishes that goal.

Taylor contends that the court erred in adopting Ali's entire exhibit as to both valuation of certain property and which party would be awarded particular property as it led to an inequitable distribution.

Both parties listed in their exhibits the Danaher stock option, Danaher restricted stock awards, and Danaher stock units accounts. Taylor assigned a value to only the Danaher stock option account of $80,707.96 and no value to the other two. His exhibit also listed the Danaher stock option account being awarded to him and the other two accounts not being awarded to either party. Ali's exhibit assigned values to Danaher stock option of $126,806, the Danaher restricted stock awards account of $30,871 and Danaher stock units of $2573, for a total of $160,250. Ali contended that all three accounts should be split equally.[6] At trial Taylor argued that because the two accounts had not vested, he valued them at $0. Since they "had *no presently available value*, they should not be shared

---

[6] All of the Danaher stock accounts accrued during the marriage.

between the parties." (Emphasis added). He continues to make this argument on appeal.

Upon our review, we agree with the district court—these accounts needed to be included in the asset distribution.

> To the extent the employee does not receive an unvested benefit if the employee leaves the employer after the divorce, the remedy is not to refuse to divide the benefit, but rather to divide it on a deferred percentage basis, so that the non-owning spouse receives a stated percentage of any value which does ultimately vest.

*In re Marriage of Crandall,* No. 15-1783, 2016 WL 4803791, at *10–11 (Iowa Ct. App. Sept. 14, 2016) (citation omitted); *see also In re Marriage of Schriner*, 695 N.W.2d 493, 498–99 (Iowa 2005) (holding, like pensions, "a future interest is properly considered as a marital asset subject to distribution"); *cf In re Marriage of Miller*, 966 N.W.2d 630, 633 (Iowa 2021) (distinguishing *Schriner* by holding payments from a future disability benefit are a replacement for income and not part of the "marital pot to be divided upon dissolution"). If these accounts were not specifically addressed in the decree and eventually vested, they would become a windfall for Taylor and ultimately result in an inequitable distribution of assets. As long as the accounts are divided equally, as the district court did here, regardless of the valuation, the distribution is equitable and will remain so. The district court correctly determined the Danaher stock accounts had to be included in the property division. *See* Iowa Code § 598.21(5)(i) (stating "[f]uture interests may be considered"). This justified rejecting Taylor's summary exhibit.

Taylor's second contention is that Ali's Exhibit 163-2 of distribution of assets and liabilities, adopted by the district court, caused an inequitable distribution. This

issue will be addressed in section III.C.ix below after we review his points challenging valuation of specific assets and liabilities.

### ii.      Valuation of the marital home.

In adopting Ali's exhibit and valuations, the district court found the marital home equity to be $70,249.  This was based on the appraisal of the home at $235,000 less the outstanding mortgage.[7]  In Exhibit FF, Taylor lists the equity at $85,000, which is the purchase price three years earlier of $250,000 less the outstanding mortgage.[8]  He contends the house repairs were no more necessary than when they bought the house.

Taylor also argues that he properly objected at trial to the admission of Ali's home appraisal and the court erred in inferentially relying on it by accepting Ali's valuation.  Ali's counsel timely filed Exhibit 125-1 as part of the pre-trial submissions.  The appraisal was "Attachment 1" to the exhibit.  Under the Trial Scheduling Order, objections to exchanged exhibits were to be made before trial began.  Taylor did not timely file an objection to the exhibit and thus waived any objection to it.  The exhibit with the attached appraisal was part of the evidence, and the court properly relied on it in deciding the marital home equity.  The district court's valuation is supported by the exhibit and was reasonable.

### iii.      Value of 2008 Toyota Highlander.

The 2008 Toyota Highlander was awarded to Ali.  Both parties offered exhibits as to the value of this vehicle based on Kelley Blue Book, a recognized

---

[7] The appraisal reduced the value of the home from the $250,000 purchase price three years earlier to $235,000 due to needed repairs, particularly the roof.
[8] In Taylor's Exhibit H, Taylor lists the home value at $260,000 and the equity at $95,000, inconsistent with his value in Exhibit FF.

source for used vehicle values. To obtain an appropriate value, certain information must be imported into the Kelley Blue Book program, such as year, model, accessories, mileage and similar factors that affect value, including whether it is a "trade-in" or a private party sale. Ali offered an initial exhibit that placed the vehicle's value between $3722 and $4861. The vehicle's value is listed in Exhibit 163-2 as $4861. She later submitted an updated exhibit to reflect that the vehicle was not a hybrid, which reduced the value range to between $3162 and $4287. Taylor's exhibit put the value at $9,065. He argues his valuation is more credible. The record shows that Ali's exhibit was based on vehicle mileage of 189,000. Taylor's exhibit did not account for high miles and he admitted that the Toyota had close to 200,000 miles. Ali's revised exhibit is the more credible. However, Exhibit 163-2 was not changed to reflect Ali's revised value based on her updated exhibit. This is to Taylor's benefit since it assigned Ali an asset value higher than the $4287 it should have been.[9] We will use the $4287 in our overall evaluation of equitable distribution.

### iv.     Value of 2007 Ford Focus.

The 2007 Ford Focus was awarded to Taylor. His exhibit supporting valuation is a Kelley Blue Book print-out showing a value of $3115. The exhibit has the upper and lower value range cut off. The only factors listed for valuation is that it is a "SE four door sedan." Ali listed the vehicle's value at $4236 in Exhibit 163-2, but she offered no evidence to back up that valuation. Instead, she argues, "The court found that Alisa's proposed distribution *accurately* sets forth the parties'

---

[9] We address below whether this amount makes the distribution of marital property inequitable.

assets and liabilities which included the value of the Ford Focus. The trial court's valuation was within the range of permissible evidence and thus, should not be disturbed on appeal."

The district court did not make a specific finding as to the value of the Ford Focus. Rather, by adopting Ali's Exhibit 163-2, the court implied Ali's value was credible, but this was without support in the record. The more credible evidence as to value is Taylor's Kelley's Blue Book exhibit. This amount should be used in determining the equitable distribution of assets and liabilities.

### v.      Marion County Bank account.

Taylor testified that this account had $0 in it. Ali submitted Exhibit 125-1, Attachment 3, which showed a balance in that account on July 15, 2019, of $3083.03. She listed this account in Exhibit 163-2 with a value of $3083 and awarded to Taylor. The district court, in adopting Ali's exhibit, found Ali's valuation more credible, as do we, since it is bolstered by a supporting document.

### vi.      Value of household and personal property.

Taylor contends the overall valuation and distribution of household and personal property was inequitable. Taylor submitted his Exhibit H, which is titled Household Items List. It sets out a detailed list of personal property, by particular rooms in the family home or category, estimates of their value, and the particular party to be awarded the item. The exhibit also contains an additional list of personal items, some with values, that Taylor requested be awarded to him.[10] The

---

[10] ASU diploma; work files; personal files; birth certificate; copy of kids' birth certificates; external hard drive images (F book); tools (on household items) see list; fishing gear—$100; softball equipment—$75; and mountain bike—$150. The fishing gear and mountain bike are listed in the itemized list. The court did not

values of the property listed in Taylor's Exhibit H total $17,725, with proposed disposition to Taylor of $3421[11] and $14,305 to Ali.

As the court stated in its decree, it compared Taylor's Exhibit FF and Ali's Exhibit 163-2 and relied on the latter in parceling out the parties' personal property. In Exhibit FF, Taylor listed the personal property (home furnishings) in two categories: furniture and appliances at $17,000 and awarded to Ali; and lawn mower and tools at $500 awarded to him.[12] In Ali's Exhibit 163-2, Ali listed Furniture and Appliances with a value of $2500 and awarded to her; and the lawn mower[13] and tools valued at $500 awarded to Taylor.

Unlike Taylor and his Exhibit H, Ali did not provide a full list of household items and values to back up the lump sum value of $2500 that appears in her Exhibit 163-2 adopted by the court. Neither party submitted evidence or testimony

---

address or award in the decree Taylor's ASU diploma; work files; personal files; birth certificate; copy of kids' birth certificates; external hard drive images (F book) and the softball equipment.

In his appeal brief, Taylor again requests the following items be awarded to him: 54″ Husqvarna riding lawn mower; copy of digital photos (children) on external hard drive; Taylor's mountain bike; Taylor's college books; graduation cap; trophies; pictures; cards; tools; reciprocating "Mider" [sic] saw; Craftsman tool box and workbench; pressure washer; two fishing poles and gear; ASU diploma and placard; work files; Taylor's birth certificate; and copies of the children's birth certificates. These items are not included in Ali's Exhibit 163-2 and not specifically mentioned by the court in the dissolution decree.

[11] Taylor purchased furniture for his residence in Pleasant Hill for $3421. Those items are not listed in Taylor's Exhibit H, but they are in Taylor's Exhibit FF for $3421 and to be awarded to Taylor. Exhibit 163-2 lists this furniture with a value of $3000 and awards it to Taylor.

[12] In Taylor's Exhibit H, the lawn mower and parts are valued at $1000 and assigned to Ali; the tools are valued at $600 and awarded to Taylor. During her testimony at trial, Ali stated that Taylor could have both the lawn mower and his tools. Again, Taylor's Exhibit H is inconsistent with his Exhibit FF.

[13] There is no mention of another lawn mower so we assume this is the Husqvarna riding lawn mower Taylor identifies.

on original purchase price, age, condition or other factors that may help determine the value of any of these items. Since Ali did not submit an itemized list with values, we cannot determine whether the parties agree on the value of any particular item.

We also observe that furniture and personal belongings lose significant value just after they are bought, used, and are no longer considered "new." Even Taylor's relatively new furniture purchased for his apartment for $3421 would likely not have a value close to the purchase price. Owners often have an inflated value of their personal property. Taylor testified he obtained values by comparing to similar items on Craigslist. What a seller lists as a price for an item on Craigslist is not indicative of what a willing buyer may be inclined to pay. Such comparisons may well be apples to oranges. Even though Taylor's list of items is very thorough, and there is a wide discrepancy between his valuation and Ali's concerning furniture and appliances, due to the lack of background information needed to properly assess the value of household items, we find no basis to revise the district court's value.

As tedious as the chore may be, the district court has the obligation to equitably divide "all" of the marital property between the parties in a decree. *See* Iowa Code § 598.21(1), (5). The district court decree made a very detailed award of the marital home, vehicles, bank accounts, Danaher stock accounts and retirement accounts. Earlier, in its findings, the court determined that Ali's Exhibit 163-2 of proposed distribution of personal property best accomplished an equitable division. However, in the decretal portion, the court awarded to Ali "the household

goods in her possession," as well as the dogs[14] and her jewelry, specifically her diamond ring. As for Taylor, the court awarded him "the household goods in his possession" and his jewelry.

Generally, the court's award tracks Exhibit 163-2 except for the lawn mower and tools. In the exhibit, those are to be awarded to Taylor, but they apparently remain in her possession since on appeal Taylor seeks to obtain these items. The decree is modified to award the lawn mower and tools to Taylor. Further, neither Exhibit 163-2 nor the court's decree considered the personal items that Taylor requested and continues to request in this appeal.[15] We modify the decree to specifically award those items in footnote 11 to Taylor.[16] We also then need to consider any value of these items awarded to Taylor in our overall evaluation of equitable distribution.

### vii. Mastiff dogs—pets or business.

Taylor claims that the Mastiff dogs were not family pets but were used by Ali as breeding dogs that generated income from the sale of pedigree puppies. He assigned a value to the dogs in his Exhibit FF of $9000. Ali's Exhibit 163-2 listed "English Mastiffs (Kya and puppies)" with no value and awarded to her.[17] Ali claims the dogs are family pets and thus should not be assigned a value. But Ali's own text messages contradict her and show she planned to take Kya to a breeder and

---

[14] The court also determined the goats and calves were the children's pets.

[15] See footnote 11.

[16] These items are of a personal nature to Taylor, and we believe they should be awarded to him.

[17] We note this listing is in the plural. Ali testified that the current puppies are not pure Mastiffs, but this conflicts with how she lists them in her exhibit. She also testified that in addition to Kya, they have a purebred Mastiff "Ammo," a female from one of Kya's previous litters. She also claims Ammo is only a pet.

that she also needed to get papers showing Kya was a purebred Mastiff. She also provided evidence that she could get between $3000 and $3500 per puppy. When Ali referred to "Kya and puppies," it is unclear how many dogs there were. Even if Kya and Ammo are found to be family pets, under this evidence there are at least two purebred puppies with a minimum value set by Ali of $3000 each, or $6000 total. The court adopted Exhibit 163-2 giving Ali the dogs with no assigned value, presumably as pets. This is contrary to the underlying evidence, and she should retain the Mastiffs but with a value of $6000.

### viii. Value and division of liabilities.

In the decree, the court divided liabilities and stated Ali "shall be solely responsible for all debts and obligations she incurred subsequent to filing this action not otherwise mentioned."[18] As to Taylor, the decree states he:

> shall be solely responsible for all debts and obligations listed on his "e-filed" December 7, 2018 Affidavit of Financial Status including, but not limited to the credit card debt listed as (P), the credit card debt listed as (R), the other debt listed as (P), his student loans, all debts and obligations he was ordered to pay pursuant to the Court's e-filed December 28, 2018 Temporary Matters Order including, but not limited to, the Kohl's debt, the Orthodontist debt, the Sam's Club debt, the Discover debt, the Chase (Amazon), the Citi debt, the PayPal debt, the Nebraska Furniture Mart debt, the outstanding medical bills for himself and the children, the Capital One debt (acct. no. 4511), the Bank of America (AQHA) debt and all debts and obligations he incurred individually either prior or subsequent to filing this action not otherwise mentioned.

Taylor's Affidavit of Financial Status e-filed on December 7, 2018, shows liabilities: credit card debt (P) - $2247; credit card debt (R) - $6,970; other debt (P) - $3,193; and student loans (P) - $6,391.[19] In Exhibit 163-2, adopted by the court, debts

---

[18] In Exhibit 163-2, Ali was assigned debt of $1906 for a loan owed to her parents.
[19] These total $18,801.

total $22,635.[20]   The amount listed for Taylor is $3363 for the Bank of America (AQHA).  All of the remaining debt assigned to Taylor is shown only as "awarded" with no dollar amounts.[21]   The bottom half of the page in the exhibit is the calculation of equitable distribution of assets and liabilities that the district court adopted in the decree.  This calculation attributes to Taylor debt liability of $3363, rather than the full amount of debt he was assigned of $20,639.[22]

Ali argues that Taylor should not get credit for debt on accounts he was ordered to pay in the Temporary Order.  If he had made payments, she contends the accounts would have been paid off and he would not have this debt.  We find that no matter if the accounts had been ordered paid in a pre-trial temporary order, those accounts remain as marital debt and must be included in the allocation of assets and liabilities and the equitable distribution.  What's more, there is no showing that even if Taylor had made regular monthly payments on these accounts that they would have been paid in full before trial.  Finally, if Taylor had used liquid assets to pay on the accounts, that would have reduced assets available for equitable distribution.  We find the assignment of debt between Taylor and Ali was appropriate, but the value of the debt attributed to Taylor failed to account for the full amount.  In the determination of an equitable division, the $20,639 of debt assigned to Taylor must be used.

---

[20] This total in Exhibit 163-2 differs from the $18,801 total in Taylor's Affidavit of Financial Status.  The district court did not prepare its own calculation of equitable division of assets and liabilities so we cannot determine whether there is overlap.
[21] The designation "awarded" is based on Taylor having been assigned these accounts and ordered to pay them in the Temporary Order.
[22]  Because none of the credit card accounts are identified, we cannot determine whether there is any duplication even though the court decree orders Taylor responsible for all of these debts.

### ix.　　Overall equitable division of assets and liabilities.

Under the circumstances of this case, we find there are sufficient assets to make the distribution of assets and liabilities more equitable. Using the values we have determined for assets and liabilities and as allocated in Exhibit 163-2 as modified by this opinion, we calculate an equitable division of assets and liabilities as set forth in the following chart and modify the decree accordingly.

| ASSET | | | VALUE | | ALISA | | TAYLOR |
|---|---|---|---|---|---|---|---|
| Family Home - Harvey, IA | | | 235,000 | | 235,000 | | |
| 2008 Toyota Highlander | | | 4,287 | | 4,287 | | |
| 2007 Ford Focus | | | 3,115 | | | | 3,115 |
| 2006 Hyundai Sonata | | | 500 | | | | 500 |
| Bank Acct. #8252 | | | 3,083 | | | | 3,083 |
| Bank Acct. #1843 | | | 151 | | 151 | | |
| 401k Acct. | | | 230,035 | | 69,778 | | 160,257 |
| Danaher Restricted Stock Awards | | | 30,871 | split | 15,435.50 | | 15,435.50 |
| Danaher Stock Options | | | 126,806 | split | 63,403 | | 63,403 |
| Danaher Restricted Stock Units | | | 2,573 | split | 1,286.50 | | 1,286.50 |
| Fidelity Account - Ind TOD | | | 22,581 | | 11,290.5 | | 11,290.5 |
| Family Home Furnishing/Appliances | | | 2,500 | | 2,500 | | |
| Lawnmower and Tools | | | 500 | | | | 500 |
| Taylor's Furniture | | | 3,000 | | | | 3,000 |
| English Mastiffs (Kya & Puppies) | | | 6,000 | | 6,000 | | |
| Items - Footnote 11 | | | | | | | |
| | Fishing gear | | 100 | | | | 100 |
| | Softball equipment | | 75 | | | | 75 |
| | Mountain bike | | 150 | | | | 150 |
| **Subtotal**[23] | | | **671,327** | | **409,131.50** | | **262,195.50** |
| | | | | | | | |
| **DEBTS** | | | **AMOUNT** | | **ALISA** | | **TAYLOR** |
| Mortgage | | | 164,751 | | 164,751 | | |
| Kohl's | | | 578 | | | | 578 |
| Discover Card | | | 3,638 | | | | 3,638 |
| Chase Amazon | | | 569 | | | | 569 |
| Student Loans | | | 5,463 | | | | 5,463 |

---

[23] The three Danaher accounts are to be divided equally and a qualified domestic relations order prepared as ordered in the district court decree. The amounts set forth in the chart are for equalization calculation purposes only.

| | | | | | | |
|---|---|---|---|---|---|---|
| Crane & Seager | | | 400 | | | 400 |
| Sam's Club | | | 3,421 | | | 3,421 |
| Nebraska Furniture Mart | | | 1,046 | | | 1,046 |
| Capital One | | | 2,161 | | | 2,161 |
| Loan from Parents | | | 1,906 | | 1,906 | |
| Bank of America AQHA | | | 3,363 | | | 3,363 |
| **Subtotal** | | | **187,296** | | **166,657** | **20,639** |
| | | | | | | |
| **NET (Assets Less Liabilities)** | | | **484,031** | | **242,474.50** | **241,556.50** |

We recognize, "An equitable division does not necessarily mean an equal division of each asset." *In re Marriage of Hazen*, 778 N.W.2d 55, 59 (Iowa Ct. App. 2009). "Rather, the issue is what is equitable under the circumstances." *Id.*

Rather than the Fidelity TOD account being awarded to Ali in the full amount of $22,581, it is to be divided equally, with each party awarded $11,290.50. Thus, both parties are awarded approximately $242,000 in marital assets. The parties shall determine whether the Fidelity account must be divided through a qualified domestic relations order and, if required, Ali's counsel shall prepare the document and submit it to the district court within thirty days of the filing of procedendo.

### D. Refinance of the marital home.

Taylor requested that the court order Ali to refinance the note and mortgage on the marital home so that the obligation would be solely hers and remove him, to set a time limit to do so, and if not done, then order the home sold. He requested this since it was agreed that Ali would be awarded the marital home as well as the obligation to make the mortgage payments. Ali acknowledged that she is not a party on the bank note that financed the purchase of the home, but she is on the

mortgage. Ali testified that she did not have the credit rating or financial ability to refinance but could probably accomplish this with her parents' financial help.[24]

The district court did not impose the obligation on Ali to refinance. The court approved the award of the marital home to Ali because she is and will continue to be the primary caregiver of the parties' four children. *See* Iowa Code § 598.21(5)(g). We agree with not imposing the refinance obligation. First, since there is significant equity, Ali has incentive to maintain the mortgage payments and not allow the note and mortgage to go into default. Further, since she does not have the credit rating, it would be almost assured she could not fulfill any refinance requirement and the house would then be sold leaving Ali and the children without a home. The court should be reluctant to impose a refinance obligation when the only way it could be met would be for parents to come forward with the funds. Finally, the court imposed on Ali the obligation to pay the note and mortgage. If she fails to do so, Taylor can bring a contempt action. *See e.g.*, *In re Marriage of Sikyta*, No. 19-2136, 2021 WL 1656233, at *6 (Iowa Ct. App. Apr. 28, 2021).

**E. Award of the tax dependency deduction.**

The district court did not provide in the decree any particular award of the tax dependency deduction. Taylor requested that the court divide and award him the child tax dependency deduction. Ali resisted. On appeal, Taylor again makes this request.

Ali argues the general rule, that the parent awarded primary care should also receive the deduction, should be followed. *In re Marriage of Okland*, 699

---

[24] Ali submitted Ali's Exhibit 144 showing credit denial due to her poor credit rating.

N.W.2d 260, 269 (Iowa 2005); *see also* Iowa Ct. R. 9.6(5). "However, courts have the authority to award tax exemptions to the noncustodial parent 'to achieve an equitable resolution of the economic issues presented.'" *Okland*, 699 N.W.2d at 269 (quoting *In re Marriage of Rolek*, 555 N.W.2d 675, 679 (Iowa 1996)). A significant consideration when awarding the dependency deduction is which parent will derive the maximum tax benefit from it. *Rolek*, 555 N.W.2d at 679.

Under the facts here, where Taylor earns significantly more income than Ali, he would receive the maximum tax benefit from the dependent deduction. We modify the decree as to the tax dependency deduction. When the parties can deduct four children as dependents, each party shall be entitled to declare two. When three children can be claimed, each party may claim one child and the third child claimed in alternating years, with Taylor claiming the first year. When two children may be claimed, each party shall claim one child. When one child may be claimed, the parties shall alternate the deduction each year, with Taylor claiming the first year.

### F. Award of attorney fee.

The district court decree stated: "These legal proceedings were protracted and expensive and both parties were to blame. However, Taylor has much greater ability to pay than Alisa. The court will order Taylor bear his own fees and to contribute $50,000 toward Alisa's attorney's fees." Taylor claims the district court erred and abused its discretion in its award.[25]

---

[25] In his rule 1.904(2) motion, Taylor requested that the court reduce the award to $20,000, which the court rejected.

Trial courts have considerable discretion in awarding attorney fees in dissolution of marriage cases. *In re Marriage of Sullins*, 715 N.W.2d 242, 255 (Iowa 2006). Awards must be fair and reasonable and based on the parties' respective abilities to pay. *Id.* "An award of attorney fees will not be disturbed on appeal in the absence of an abuse of discretion." *In re Marriage of Wetzel*, No. 01-0745, 2003 WL 553979, at *2 (Iowa Ct. App. Feb. 28, 2003). "Factors for the court to consider in making an award include (1) time spent, (2) nature and extent of the service, (3) the amount involved, (4) the difficulty of handling, (5) importance of issues, (6) responsibility assumed, and (7) the results obtained." *Id.* "The fees must be reasonably and rationally related to the case as a whole." *Id.* The district court is considered an expert in what constitutes a reasonable attorney fee. *GreatAmerica Leasing Corp. v. Cool Comfort Air Conditioning & Refrigeration, Inc.*, 691 N.W.2d 730, 733 (Iowa 2005).

Here, Ali retained her attorney while unemployed but with her father's financial assistance. For child support calculation purposes, the court had to assign Ali a minimum wage income since she had not worked since 2003. On the other hand, Taylor earned a fairly significant annual income of $128,852. The parties' joint net worth was found to be just under $500,000. The combined attorney fee affidavits of both Ali and Taylor amount to in excess of $170,000, exceeding thirty-five percent of the parties' total net worth.[26] Paying these fees also requires liquidation of a 401(k) retirement account, a significant portion of their retirement savings, which will likely incur both income tax and early-withdrawal

---

[26] Ali's attorney fee affidavit totaled $119,261.40. Taylor's attorney fee for three different attorneys was $52,000 through the second day of trial.

penalty obligations. In considering the attorney fees here, we find Taylor's obligation should be reduced given limited assets available for liquidation and the respective incomes of the parties, particularly Taylor's ability to pay.

Under *Seymour v. Hunter*, 603 N.W.2d 625, 627 (Iowa 1999), after finding an abuse of discretion, we may set the amount of attorney fee to be awarded and remand the case to the district court for entry of an order imposing such fee. Based upon our review of the factors in *Wetzel,* particularly factoring in Taylor's limited assets from which to pay this award, we determine Taylor should be ordered to pay $25,000 of Ali's trial attorney fees. Having set this award, we note this reduction does not limit Ali's attorney's ability to seek the balance under the attorney contract, only the amount that her former husband is required to contribute.

### G. Appellate attorney fees.

Ali requests an award of appellate attorney fees. Again, we have broad discretion in this award and consider the relative financial positions of the parties and the merits of the appeal. *In re Marriage of McDermott*, 827 N.W.2d 671, 687 (Iowa 2013). We cannot determine whether Ali should be awarded appellate attorney fees based on the record before us. Her counsel has not submitted an attorney fee affidavit, and we do not know if either her or Taylor's employment or income have changed since this appeal was initiated. We must therefore remand to the district court to determine whether a reasonable award of appellate attorney fees should be made to Ali after the filing of necessary supporting documentation. *See In re Marriage of Heiar*, 954 N.W.2d 464, 473–74 (Iowa Ct. App. 2020). Costs of appeal are assessed equally to both parties.

## IV. Conclusion.

Having considered all the issues raised in this appeal, we affirm the court decree as modified herein and remand for further proceedings, including entry of a modified decree consistent with this opinion.[27]

**AFFIRMED AS MODIFIED AND REMANDED.**

---

[27] Because we have no way of knowing whether Taylor is current on his original spousal support or trial attorney fee obligations, we cannot determine whether the downward modification provided for in this opinion has resulted in an overpayment by Taylor. If it has, and the parties cannot reach an agreement on how to allow Taylor to recover any overpayment, the district court on remand shall determine an appropriate method for Taylor to recoup any overpayment. The district court shall have the option of making such determination based on the current record or by conducting a hearing to gather updated information. *See In re Marriage of Houser*, No. 19-1666, 2021 WL 1016923, at *2 n.1 (Iowa Ct. App. Mar. 17, 2021) (finding it appropriate to allow the district court to determine the best method for determining how to recover an overpayment after a downward modification of a spousal support award).